UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RENEE INFANTADO,

        Plaintiff,                  CIVIL ACTION NO. 05-CV-72124-DT

        vs.                          DISTRICT JUDGE GERALD E. ROSEN

COMMISSIONER OF          MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

**RECOMMENDATION:** This Court recommends that Defendant's Motion For Summary Judgment be GRANTED, and Plaintiffs Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

This is an action for judicial review of the final decision of the Commissioner of Social Security that the Plaintiff was not entitled to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423(d). The issue for review is whether there was adequate support for the Commissioner's decision that the Plaintiff is not disabled.

Plaintiff Renee Infantado filed an application for DIB on September 18, 2001, alleging that she had been disabled since April 1, 1994. (Tr. 52). Plaintiff's last insured date was December 31, 1997. Plaintiff's application was initially denied. (Tr. 36). Plaintiff sought administrative review and received a hearing before ALJ Peter C. Americanos on December 12, 2004. (Tr. 624-688). The ALJ denied Plaintiff's claims in a written opinion issued on June 23, 2004. (Tr. 19-26). Defendant denied Plaintiff's request for reconsideration of the hearing decision, and the ALJ's decision is now the final decision of the Commissioner. (Tr. 3-5); 20 C.F.R. § 404.981. Plaintiff has appealed the ALJ's decision to this court. Both Parties have filed motions for summary judgment.

## MEDICAL HISTORY

Plaintiff was born under on July 20, 1965. (Tr. 52). Plaintiff suffers from congenital adrenal hyperplasia ("CAH"), a genetic disorder characterized by underproduction of the hormone cortisol. Three quarters of CAH patients also produce insufficient amounts of the hormone aldosterone. Plaintiff is a genetic female, but she was born with ambiguous genitalia, likely as a result of her CAH, and underwent sex reassignment surgery. The hormone deficits caused by CAH can cause a variety of problems, including low blood pressure, fatigue, and digestive problems. CAH patients typically take oral steroids to make up for their naturally occurring hormone deficits. These treatments, however, can be imperfect. Because the hormones are administered orally and several discrete doses are taken throughout the day, the hormone levels in CAH patients can vary more widely than the hormone levels of a person with normal adrenal systems. In addition, long term use of the steroids can lead to many side effects, including a weakened immune system.

On December 6, 1996 Juan Estigarriba, M.D. stated that Plaintiff could return to work "without any contraindication." (Tr. 110). Dr. Estigarriba noted that Plaintiff "has to take only her hormone therapy. She knows the consequences." *Id.* Treatment notes indicate that Plaintiff saw Dr. Estigarriba frequently in 1996, and that Plaintiff repeatedly complained of abdominal or chest pain. Dr. Estigarriba eventually recommended that Plaintiff undergo a duodenoscopy. The procedure, performed on August 4, 1997, revealed that Plaintiff's duodenum was normal. (Tr. 134). Dr. Estigarriba continued to see Plaintiff frequently in the late 1990s. Plaintiff continued to complain intermittently of severe abdominal pain and other problems that Dr. Estigarriba considered as evidence that Plaintiff's body was not receiving enough replacement hormones to treat her CAH. On February 19, 1999, Dr. Estigarriba's treatment notes indicate that Plaintiff told Dr. Estigarriba that she was "kind of depressed." (Tr. 113). Dr. Estigarriba instructed Plaintiff to see a psychiatrist, but she refused. *Id.* On October 19, 1999, Dr.

Estigarriba stated, "I suspect Plaintiff is not taking enough hydrocortisone steroid." (Tr. 114). Plaintiff continued to suffer severe CAH symptoms in 1999 and 2000. On March 17, 2000 Dr. Estigarriba stated, "I think she is either not taking her medication or she needs to take more. She says she is taking it, so I told her to increase it [.]" (Tr. 114). On April 18, 2000 Dr. Estigarriba stated that Plaintiff was not taking enough steroids. (Tr. 117). On May 22, 2000 Dr. Estigarriba noted that, "[Plaintiff] is not taking her hydrocortisone the way I told her to and this is the reason her ACTH is very high, she is losing weight, and not feeling well." *Id.* On November 11, 2000 Dr. Estigarriba noted that Plaintiff "is a very difficult lady, non-compliant[.]" *Id.*

On December 17, 2001 R. Hasan M.D., a psychiatrist, performed a psychiatric interview of Plaintiff on behalf of the Michigan Disability Determination Service. (Tr. 301). Plaintiff reported that had a difficult childhood, and that she had been sexually abused by her stepfather. *Id.* Dr. Hasan noted Plaintiff to be in touch with reality, with low self esteem, no motivation, and some insight. *Id.* Plaintiff reported flashbacks and nightmares, but no hallucinations, delusions, or suicidal or homicidal thoughts. *Id.* Plaintiff reported having panic attacks in crowds or while driving. *Id.* Dr. Hasan concluded that Plaintiff suffered from posttraumatic stress disorder, a mood disorder, fibromyalgia, and adrenal hyperplasia. *Id.* He gave her a Global Assessment of Functioning ("GAF") score of 55 points out of 100 and a guarded prognosis. (Tr. 302).

On February 20, 2002 Zahna Yousuf, M.D. performed a mental capacity assessment of Plaintiff. (Tr. 303-04). Dr. Yousuf assessed Plaintiff to have moderate limitations in her abilities to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, or to set realistic goals or make realistic plans independently of others. (Tr. 303-304).

On May 17, 2003 Kenneth Colton, D.O. performed a physical residual functional capacity form describing Plaintiff. (Tr. 322-323). He checked boxes indicating that Plaintiff could sit for up to two

hours in an eight-hour work day, and could stand or walk for a total of less than one hour workday, could lift no more than ten pounds occasionally, could not lift any amount of weight frequently, and could not repetitively grasp, push, pull, or finely manipulate objects on a sustained basis with either arm. (Tr. 322). He also checked a box indicating that Plaintiff required complete freedom to rest or take breaks during work, and could not tolerate even work that involved one scheduled 20 minute break per hour. (Tr. 323).

On July 2, 2003 Dr. Colton filled out a form sent by Plaintiff's attorney. (Tr. 324). In that form, he indicated that he had seen Plaintiff roughly twenty-five times in the period from September 2000 to May 2003. He wrote that Plaintiff had CAH and anxiety problems, and suffered from pain and fatigue. (Tr. 325). Dr. Colton checked boxes indicating that Plaintiff could not perform light or sedentary work. (Tr. 326). Dr. Colton also noted that the anxiety component of Plaintiff's disorder caused her to exaggerate some of her symptoms, that medical signs and laboratory findings did not support the existence of Plaintiff's complaints of chest and abdominal pain, and that he suspected Plaintiff's psychological problems contributed to those allegations. (Tr. 325).

Sometime in July 2003, Vijay Ramesh, M.D. examined Plaintiff, produced a psychiatric medical report and a mental residual functional capacity assessment. (Tr. 337-342). The documents are time stamped July 22, 2003, by the office of Plaintiff's attorney. *Id.* Dr. Ramesh had been sent a letter with the forms, pointing out that Plaintiff's date last insured was in 1997, noting that Dr. Ramesh's conclusions would be of greater legal relevance if they related to Plaintiff's condition in 1997, and strongly encouraging Dr. Ramesh to make conclusions about Plaintiff's condition in 1997, even though Dr. Ramesh had not examined Plaintiff prior to 2003. (Tr. 336). The first page of Dr. Ramesh's report contains a note handwritten in boldface using a hand apparently different from the one Dr. Ramesh

used to complete the rest of the evaluation or sign his name. (Tr. 337). It states, "* all findings pertain to period prior to 12/97*[.]" *Id.*

Dr. Ramesh noted Plaintiff's complaints of depression, anxiety, insomnia, and her reported difficulties with driving and maintaining concentration. (Tr. 337-340). Plaintiff reported that she entirely lacked interest or motivation, and Dr. Ramesh observed Plaintiff to be anxious and crying. *Id.* He also noted that Plaintiff was oriented, cooperative, withdrawn, tired, and unmotivated. *Id.* Plaintiff has normal speech but apparent difficulty remembering things. (Tr. 339-342). Dr. Ramesh concluded that Plaintiff suffered from major depression and post-traumatic stress disorder, he gave Plaintiff a GAF score of 45 out of 100. On the mental residual functional capacity form, Dr. Ramesh indicated that Plaintiff had marked difficulty remembering locations or work-like procedures, understanding, remembering, or carrying out any more than one or two step instructions, maintaining concentration, working with others, making simple decisions, completing a normal workday, interacting with the general public, responding appropriately to normal hazards or changes in work settings, setting realistic goals, or making plans independently of others. (Tr. 344).

## **HEARING TESTIMONY**

At the outset of the December 12, 2004 administrative hearing before ALJ Peter C. Americanos, the ALJ noted that he was adding recently received evidence into the administrative record. (Tr. 626). Plaintiff then testified. (Tr. 633). Plaintiff testified that she was impaired by fibromyalgia, CAH, and irritable bowel syndrome. (Tr. 633-54). She alleged that her irritable bowel syndrome began in 1997, and that she occasionally suffered from bouts of diarrhea that caused her to use the bathroom six time a day. (Tr. 640-641). Plaintiff also complained that she suffered from anxiety, and depression, and that these conditions caused her to be shaky, confused, and unable to be around other people. (Tr. 644). Plaintiff stated that she had been suicidal periodically since she was a child. (Tr. 647).

Plaintiff testified that she felt pain in her legs, arms, and back, and estimated the average severity of her pain to be seven or eight points on a ten-point scale. (Tr. 649). Plaintiff did not report taking any pain medication. (Tr. 649). She also reported being able to sit for about twenty minutes before getting stiff and needing to stand, being able to stand for up to thirty minutes, and being able to walk a half block before having to rest. *Id.*

Plaintiff testified that she drove, attended church, visited her godmother, played board games with her eleven year old child, helped the child with his homework, and helped prepare meals. (Tr. 652-3, 668).

The ALJ also took testimony from a medical advisor, Emily Giesel, M.D. (Tr. 670). Dr. Giesel testified that, based on her review of the medical records, Plaintiff did not meet or equal any of the medical listings in the period between 1994 and 1997. (Tr. 673). She also opined that Plaintiff had the functional capacity to do more than sedentary work and could not work in environments that would expose her to large crowds, heights, dangerous machinery, or extremes of temperature or humidity. (Tr. 674-75). She testified that Plaintiff might want to avoid environments with broken and sharp objects because of the possibility that her immune system would have difficulty fighting off infection, though the medical evidence did not show that Plaintiff historically had difficulty with wound healing. (Tr. 676). Dr. Giesel also testified that her review of the medical evidence did not show any specific incidence of incontinence. (Tr. 677).

The ALJ also took testimony from a vocational expert, Richard Szydlowski. (Tr. 678). The vocational expert was asked to testify about the availability of jobs for a hypothetical person of Plaintiff's age, gender, and educational level who had certain functional limitations. The ALJ asked the vocational expert to testify about the availability of work for a person capable of performing sedentary work with no exposure to unprotected heights, dangerous machinery, extremes of temperature or humidity, cutting

implements, power tools, or environments posing risks of deep cuts, or very large crowds, with the ability to take a five minute unscheduled work break each day and twelve days off per year. (Tr. 679). The vocational expert testified that while such a person could not do any of Plaintiff's past work, she could work as a clerical handler, inspector, checker, or surveillance system monitor, and estimated that there were at least six thousand such jobs available in the regional economy. (Tr. 681). When asked whether there would be work available for such a person if she also needed an additional fifteen minute scheduled break every morning, the vocational expert testified that an employer might accommodate that limitation, but that it would make the hypothetical person a less competitive job applicant. (Tr. 682-83).

## **STANDARD OF REVIEW**

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite

conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

## **DISCUSSION AND ANALYSIS**

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff had to show that:

(1) she was not presently engaged in substantial gainful employment; and

(2) she suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) she did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R.. § 416.920(a)-(e). If Plaintiff's impairments prevented her from doing her past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work. If she cannot, she would be deemed disabled. 20 C.F.R. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff argues that new evidence requires a remand under 42 U.S.C. § 405(g) for rehearing of Plaintiff's claims. In order to obtain a remand on the basis of evidence not submitted to the ALJ, Plaintiff must (1) show good cause for failing to introduce the evidence into the administrative record prior to the ALJ's decision, and (2) that the new evidence is sufficiently material that there is a

reasonable probability that the ALJ would have reached a contrary disposition had he considered the evidence. *Willis v. Sec'y of Health and Human Servs.*, 727 F.2d 551, 553-4 (6th Cir. 1994); *Sizemore v. Sec'y of Health and Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). Plaintiff argues that "flow sheets" from Dr. Estigarriba and Plaintiff's birth record were improperly excluded from the administrative record. Even assuming that Plaintiff has demonstrated good cause for failing to introduce the new evidence to the administrative record, she has failed even to argue that the ALJ would have reached a contrary decision had he considered the evidence. Plaintiff does not allege that she had been disabled since birth, and her birth records are therefore of little relevance to the ALJ's decision. The record already contains Dr. Estigarriba's "flow sheets" from 1989 through 1997. Given that Plaintiff's alleged onset was in 1994 and that her last insured date was in 1997, it is highly unlikely that the ALJ would have changed his decision on the basis of a review of the flow sheets from before 1989 or after 1997.

Plaintiff argues that the ALJ failed to give proper deference to statements made by Dr. Colton in 2000 that Plaintiff contends relate back to her condition in 1997 and before. Plaintiff contends that Dr. Colton's statements were entitled to mandatory deference under the "treating physician rule." The treating physician rule requires that an ALJ give complete deference to the well-supported statements of treating physicians that are consistent with other substantial evidence of record. *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993). It is undisputed that Dr. Colton treated Plaintiff several times in 2000. However, an ALJ may reasonably discount the opinions or statements of a treating physician when those statements are unsupported by objective evidence, or when they conflict with other medical evidence on the record. *McCoy o/b/o/ McCoy v. Chater*, 81 F.3d 44, 47 (6th Cir. 1995).

Dr. Estigarriba, the physician treating Plaintiff in 1996 and 1997, noted that Plaintiff could return to work "without counterindication." On the basis of examinations made after 1997, Dr. Colton concluded that Plaintiff could not work at all. Dr. Estigarriba's opinion directly contradicts Dr. Colton's

-9-

opinion. As Dr. Estigarriba was also a treating physician, the ALJ was free to prefer his opinion of Dr. Colton's. The fact that Dr. Estigarriba's opinion was rendered contemporaneously, rather than years after the fact, was good reason for the ALJ to give that opinion greater weight than Dr. Colton's opinion. Portions of Dr. Colton's opinion are without support in the medical record. He opined that Plaintiff can only sit for two hours and stand or walk for up to three hours in an eight-hour period, could not use her hands or legs repetitively for any purpose whatsoever. As the medical expert pointed out during the administrative hearing, these impairments are not suggested by any of the objective medical evidence on the record.

Plaintiff also argues that the opinion of Dr. Ramesh concerning Plaintiff's mental impairments is entitled to binding weight under the treating physician rule. The ALJ gave greater weight Dr. Yousuf's less restrictive evaluation of Plaintiff's mental impairments. While the face of Dr. Ramesh's opinion contains a note that it "pertains to the period prior to 12/97" the circumstances surrounding that note and the opinion itself gave the ALJ some reason to discount Dr. Ramesh's opinion. Dr. Ramesh did not begin to treat Plaintiff until 2002, some five years after Plaintiff's last insured date. Dr. Yousuf's 2001 evaluation of Plaintiff's psychological records is also based on a review of the medical evidence taken years later, and is as probative of Plaintiff's condition from 1994 to 1997 as Dr. Ramesh's opinion. The ALJ was free to rely on Dr. Yousuf's opinion that Plaintiff's psychological condition limited her to unskilled, sedentary work, but was not totally disabling before the end of 1997. The ALJ's finding concerning that Plaintiff's mental residual functional capacity permitted her to perform sedentary, unskilled work was supported by substantial evidence on the record.

Plaintiff argues that the ALJ incorrectly instructed the vocational expert. She points out that in the ALJ's written opinion, the ALJ described Plaintiff as having the capacity for sedentary, unskilled work with specific limitations. During his questioning of the vocational expert, however, the ALJ did

not mention that the Plaintiff was confined to unskilled work. However, the vocational expert noted during the hearing that Plaintiff has no past skilled work, and indicated that Plaintiff does not have any transferrable skills. (Tr. 678-79). In addition, the jobs that the vocational expert testified were available to Plaintiff were all in the "unskilled" category. (Tr. 679-681). Looking at the record as a whole, the vocational expert clearly limited himself to a review of unskilled positions because Plaintiff's vocational and educational history did not include any transferable skills. The vocational expert's testimony was therefore substantial evidence in support of the ALJ's step five finding.

Finally, Plaintiff argues that the ALJ failed to properly assess Plaintiff's credibility. 20 C.F.R. §§ 404.929, 404.1529 require that an ALJ's credibility determination be made after weighing a variety of factors, including the state of the objective medical evidence, treatment history, physician opinions, and a claimant's daily activities. Social Security Ruling 96-7p requires that an ALJ's credibility findings must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. The ALJ's opinion clearly finds Plaintiff partially but not entirely credible. The ALJ's written opinion states that Plaintiff's credibility is undermined by conflicts between some of her claims and the objective medical evidence, treatment history, and contemporaneous medical opinions. (Tr. 24). The opinion specifies what these conflicts are, and what portions of Plaintiff's testimony the ALJ decided not to credit. *Id.* The ALJ's credibility determination adequately comports with 20 C.F.R. §§ 404.929, 404.1529 and S.S.R. 96-7p.

## **RECOMMENDATION**

Plaintiff's Motion for Summary Judgment should be DENIED. Defendant's Motion for Summary Judgment should be GRANTED.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1)

and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: July 26, 2006                s/ Mona K. Majzoub
                                    MONA K. MAJZOUB
                                    UNITED STATES MAGISTRATE JUDGE

**Proof of Service**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: July 26, 2006                s/ Lisa C. Bartlett
                                    Courtroom Deputy